Theodore R. LUCAS, Plaintiff,

v.

Margaret SPELLING, in her official capacity as Secretary, U.S. Department of Education, Defendant.

Civil Action No. 01–2393 (JMF).

United States District Court, District of Columbia.

June 15, 2007.

See also, 2006 WL 1663485.

---

John F. Karl, Jr., Karl & Tarone, Stephen C. Leckar, Butera & Andrews, Washington, DC, for Plaintiff.

Mercedeh Momeni, Andrea McBarnette, U.S. Attorney's Office, Washington, DC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FACCIOLA, United States Magistrate Judge.

This case was referred to me for trial upon consent of the parties. After considering the testimony of the witnesses, the exhibits, and the arguments of the parties, I make the following findings of fact and conclusions of law.

## BACKGROUND

Plaintiff, Theodore R. Lucas ("Lucas" or "plaintiff"), alleges that he was discriminated against in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.,[1] when he was not selected for the GS–13 position of Management & Program Analyst in the Department of Education's Office of Civil Rights ("OCR").

## FINDINGS OF FACT

1. Dr. Paul Fairley ("Fairley"), the selecting official, was born on January 31, 1939. He received a B.S. from Morgan State and an M.A. and Doctorate from the University of Miami. Fairley retired from the government in 2000. He worked for the Office of Management and Budget from 1971 to 1985. During that time, he worked as a senior budget analyst in the income maintenance branch. He also worked on Older American Act programs, which provided services for the elderly. He then worked for the OCR, where he was the Director of Resources Management and an Executive Officer.

2. The Resources Management Group has responsibility for information technology, customer service, human resources, and the budget. As an Executive Officer, Fairley was a liaison with the regional offices regarding purchases and administrative matters.

3. The OCR's Customer Service Office, comprised of between twelve and fifteen people, processed appeals, reviewed and analyzed complaints, and reviewed and analyzed correspondence from the White House, members of Congress, and various associations, including the National Association for the Advancement of Colored People, Parent Teacher Associations, regional offices, and the press. Employees were expected to be familiar with numerous statutes including the Rehabilitation Act (Section 504), 29 U.S.C. § 794, the Civil Rights Act, (Titles VI, IX, II), 42 U.S.C. §§ 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.

4. In March of 1998, the DOE posted Vacancy Announcement No. 98–087VB for the GS–343–13 position of Management & Program Analyst for the OCR. The announcement's opening date was listed as March 23, 1998 and its closing date was listed as April 3, 1998.

5. Fairley wanted to fill the position with a project manager with leadership skills. Fairley also wanted the individual to have quasi-supervisory responsibilities but not evaluative responsibilities.

6. Applicants for the vacancy were required to submit either a resume, an Optional Application for Federal Employment (OF–612), a Standard Form SF–171, or another applica-

---

**1.** All references to the U.S.Code are to the electronic versions in Westlaw or Lexis.

tion format of the applicant's choice. In their applications, applicants were required to address their previous work experience and educational accomplishments. Applicants were further required to have at least fifty-two weeks of specialized experience at the GS–12 level. The announcement did not require that the applicant have either an undergraduate or graduate degree.

7. The announcement listed five evaluation criteria, also known as "KSA's" or knowledge, skills, and abilities, and provided their respective numerical weights (with ten being the highest total score that any individual candidate could receive). Fairley, along with another employee, Nick Dorka, reviewed the KSA's and assigned the weight to be given to each.

8. The first KSA, "Knowledge of Federal, Departmental, and OCR policies and procedures," was given a weight of 2.0. The second KSA, "Knowledge of the principles of management analysis and the ability to apply them to a variety of program support projects," was given a weight of 2.0. The third KSA, "Knowledge of OCR systems," was given a weight of 2.0. The fourth KSA, "Ability to function as a group leader, work well with a variety of individuals and resolve issues," was given a weight of 1.5. The fifth and final KSA, "Ability to communicate effectively both orally and in writing," was given a weight of 2.5.

9. After receiving all of the applications for the GS–343–13 Management & Program Analyst position, Verna Braxton ("Braxton") of the DOE personnel office rated and ranked the candidates. According to Brax-

ton, Jerelyn Berry ("Berry"), the final selectee, was the most qualified individual for the position. Berry received a score of 95.125 points and plaintiff received a score of 94 points.

10. On May 1, 1998, following Braxton's review of the applications, Braxton prepared a Certificate of Eligibles and gave it to Fairley. Four individuals were listed on the Certificate of Eligibles: 1) plaintiff, 2) Berry, 3) Lucinda Powell ("Powell"), and 4) Sandra Ward–Wooton ("Ward–Wooton").

11. Plaintiff was born on September 13, 1936.

12. Plaintiff joined the military after high school. He attended Florida A & M University and then Howard University Law School. He did not pass the bar exam and has never practiced law.

13. Plaintiff worked first in the Executive Office of the President's Cost of Living Council's Office. He then worked in the Equal Employment Opportunity Commission's ("EEOC") General Counsel's Office. After leaving the EEOC, plaintiff worked at the Department of Housing and Urban Development, and then at the National Aeronautics and Space Administration. Finally, plaintiff took a position with the OCR, where he worked for between twenty-two to twenty-three years as a Management Analyst in the OCR's Customer Service Office, part of the Resource Management Group.

14. Plaintiff first met Berry when both of them were working in the Contract Compliance Department. Berry initially worked as his secre-

tary. She also provided support for others in the department.

15. Plaintiff's other responsibilities as a Management Analyst included 1) drafting guidelines to determine which school districts would qualify for certain awards, 2) acting as a liaison with the OCR's compliance department, and 3) reviewing the OCR's policies and procedures regarding the Electronic Library, an electronic database of all statutes and documents used by the OCR.

16. Originally, plaintiff, in conjunction with two other attorneys and an information technology employee, was given the responsibility of setting up part of the Electronic Library. After the Library was started, plaintiff continued to review the documents for accuracy before they were inserted into the database.

17. Plaintiff was also asked by his supervisor, Ann York Dooley ("Dooley"), to lead a team in the preparation of the OCR's Annual Reports to Congress, known as the Blue Ribbon Reports.

18. Dooley retired from the OCR in 1997. During her last year at the OCR, she led one of the customer service teams. At one point, Fairley was Dooley's immediate supervisor. At another point, Fairley was her peer. Dooley never socialized with Fairley.

19. Dooley was involved in the formation of the position description. Although she did not write it, she did review it.

20. While in customer service, Dooley supervised approximately twelve people, including Lucas, Berry, Powell, and Ward–Wooton.

21. Dooley felt that plaintiff was a difficult employee and unwilling to take on extra assignments. Dooley also felt that he had to be closely monitored. Specifically, Dooley recalled that during one of the investigations for the Blue Ribbon Reports, plaintiff made a decision to deny an award prior to the completion of the investigation, something that violated the procedures and should not have been done. Dooley recalled further that plaintiff didn't check with her before making such a decision, nor did he clear it with the Office of the Regional Director. As a result of plaintiff's actions, Dooley's office was sharply criticized and she was called in to speak directly to the Deputy Assistant Secretary. Also, all of the department's work during a set period of time was reviewed. Dooley felt that plaintiff's actions had downgraded the status of the team.

22. After this incident, certain duties were taken away from plaintiff and given to other employees.

23. In addition to problems with plaintiff's work, there were problems between plaintiff and the OCR support staff. Several members of the support staff complained that plaintiff would refuse assignments and was rude and insulting in his dealings with them. When Dooley spoke to plaintiff about the problems, he was dismissive about the issue.

24. Dooley noticed that at staff meetings, plaintiff would come late, leave early, not respond when called, and close his eyes during the meeting. He didn't involve himself and acted like the meetings were a complete waste of his time.

He also often left meetings to take smoke breaks.

25. Fairley was plaintiff's second line supervisor.

26. On occasion, plaintiff and Fairley would smoke a cigarette together and discuss politics.

27. At one point, plaintiff wrote a letter to the Secretary of the DOE complaining that Fairley wasn't fit to be a supervisor.

28. While working under Fairley, plaintiff was initially given the authority to sign correspondence on Fairley's behalf. However, after DOE headquarters received complaints from several regional directors about mistakes that had been made by the OCR, specifically regarding correspondence that plaintiff had signed on behalf of Fairley, Fairley took away plaintiff's authority to do so.

29. At the time of the selection, plaintiff was serving as a GS–343–12 in the OCR and was sixty-two (62) years old.

30. Berry was born on January 26, 1955.

31. Berry graduated from high school and earned some credits from Prince George's County Community College.

32. Berry began working for the agency in June of 1973. She began as a GS 2 Clerk/Typist. In total, she has been with the DOE for thirty-four years.

33. Berry was in the Army Reserves for twelve years.

34. When the Electronic Library was first started, Berry was responsible for making sure that updates were made to the documents. First, she would receive materials from the legal staff. These materials then had to be stored, processed, and then sent back to the regional offices, where they were shredded. Berry was also responsible for coordinating duties between the regional office staff and the program legal staff, including scheduling the regular teleconference calls between the staffs.

35. While at the DOE, Berry took classes in management, computers, and communications.

36. Berry knew the individual who initially drafted the interview questions, Art Besner ("Besner"). On occasion, she would go to him for help.

37. Berry shared an office with plaintiff in 1996.

38. Berry had little contact with Fairley.

39. Berry, like plaintiff, was also directly supervised by Dooley. Dooley and Berry were friends at the office. Dooley thought that Berry was a very cooperative employee and always willing to take on extra work to help others. Dooley thought Berry had a good attitude toward her work.

40. Dooley thought Berry's oral communication skills were excellent and that she had no difficulty working with people at the same and higher levels. Dooley also thought that she was a capable group leader, able to coordinate with staff of various levels, successful in getting people to participate in the work of the team, and very even tempered.

41. At the time of the selection, Berry was serving as a GS–343–12 in the OCR and was forty-three (43) years old.

42. Powell was born on July 8, 1939. She worked at the OCR from April of 1979 to December 1, 2003. She attended college at the University of Great Falls, Montana, where she received a B.S. in Education with a minor in Psychology. She taught for one year and then received her M.A. in Education Administration and Supervision at Trinity College in Washington, DC.

43. Powell had a poor opinion of Berry's capability to perform the job that she got. Powell believed that Berry did not have a clear understanding of the pertinent laws and did not understand the difference between a complaint and a compliance review. According to Powell, Berry was "not the brightest star." Powell thought Berry lacked experience as an investigator and lacked the background to do compliance reviews.

44. In Powell's opinion there was evidence of favoritism in the OCR's personnel practices. Specifically, Powell believed that persons who were liked by Dooley were favored for certain employment responsibilities. In Powell's view, Berry was one of the persons so favored.

45. At the time of the selection, Fairley was the second level supervisor for the position and Eleanor Baker ("Baker") was the Customer Services Unit's acting head and the immediate supervisor for the position.

46. Although he had no obligation to do so, Fairley decided to empanel a group of the OCR employees to interview each of the applicants that was listed on the Certificate of Eligibles. Finally, Fairley wanted panelists who were at least GS–13's. Pursuant to the terms of the written selection process negotiated between the DOE and its employee union, Fairley consulted with Ben Miller ("Miller"), one of the union representatives and a Management Analyst for the OCR. Fairley wanted the selection process to be as transparent as possible.

47. As a union official, Miller was responsible for appointing persons to sit on interview panels. In that capacity, Miller appointed Gloria Threadgill Butler ("Butler"), a GS–13 Program Analyst at the OCR and forty-nine (49) years old at the time of the selection, and Janice Pottker ("Pottker"), a GS–13 Program Analyst at the OCR and also forty-nine (49) years old at the time of the selection.

48. Fairley, in turn, appointed David Berkowitz ("Berkowitz"), a GS–14 Program Analyst at the OCR and thirty-eight (38) years old at the time of the selection, and Jan Gray ("Gray"), a GS–14 Attorney at the OCR and thirty-seven (37) years old at the time of the selection.

49. Berkowitz received his B.A. from Brandeis University and his J.D. from the National Law Center at George Washington University in 1986. He has worked as a lawyer in the Office of Civil Rights since 1987 and now has the title "Senior Investigator."

50. Fairley asked him to be a member of the panel and he met with his fellow members to discuss their task. Berkowitz recalled that the panel was looking for an applicant who had relevant experience, with a capacity for leadership, and satisfactory program knowledge.

51. He also recalled how the panel developed the questions to be asked during the interviews and that Gray asked most of the questions.

52. The panel's decision was unanimous once they had Butler's proxy.

53. Berkowitz's overall impression was that Lucas provided general and sketchy answers to the questions while Berry provided more specific answers that accurately reflected her experience and program knowledge. He also recalled one panel member's speaking of Berry's grammar.

54. Berkowitz recalled that the panel had the SF–171's but that education was irrelevant. The panel was much more interested in the applicants' capacity for leadership and program knowledge. On those bases, the panel found that Berry was the most qualified and decided that the panel would select her as its choice.

55. In his testimony, Berkowitz reviewed each of Berry's and Lucas's answer to the panel's questions. In certain instances he found that the answers they provided were incorrect. In other instances, Berry provided more complete answers to the questions, reflecting her superior leadership capability and program knowledge. He admired how specific she was in describing how she would handle the hypothetical situations that the questions presented and how she provided specific examples of how she had served as a group leader. On the other hand, he found that Lucas's answers did not indicate how he had been in a leadership role or provide specific indications of how he would handle the hypothetical situations the questions posed. Berkowitz was also troubled by Lucas's indicating that he had no weaknesses.

56. Gray received both her B.A. and J.D. from Howard University and joined the Department of Education in 1990. She has a particular expertise in the interpretation of Title IX9USCAS2000EUSCA of the Education Amendments of 1972, 20 U.S.C. § 1681, and questions pertaining to that statute are referred to her.

57. Gray recalls that the panel met and the members were each given a package containing the applications and a series of questions to be used during the interviews of the applicants. The panel considered these questions too difficult and otherwise inappropriate. They collaborated on a new set of questions, keeping less than half of the original questions given the panel.

58. Gray did not share these questions with anyone else.

59. Gray recalled that Berry's application went through the KSA's in detail, matching what Berry had done to each of the KSA's.

60. Gray saw Lucas frequently and had a friendly relationship with him.

61. Gray's overall impression of Lucas's interview was not a good one. She thought that his answers were frequently unresponsive, he did not have what she called an adequate "knowledge base" upon which to predicate his answers, and he did not recognize the deficiencies in that knowledge base.

62. On the other hand, Gray was very favorably impressed with Berry. Gray thought that Berry's answers

were thorough and complete. While Gray thought that Berry was slightly nervous at first, she grew more comfortable as the interview progressed and Gray didn't think that Berry's initial nervousness affected the accuracy of her responses.

63. Berry was easily the best applicant; she "stood out." Had it not been for her, the decision among the remaining applicants would have been difficult. With her, it was not; she was overall the best.

64. During her testimony, Gray reviewed each of the answers given to the questions the panel posed. While, like Berkowitz, she found that on occasion Berry and Lucas gave incorrect answers, she found that Berry's answers were consistently superior to Lucas's. She found that, for example, while Lucas did not answer the first question, Berry did and her answer displayed that she was proud of the completion of an assignment that Gray described as massive. Gray noted, as Berkowitz did, that Lucas said that he had no weaknesses, an answer she found to be arrogant. On the other hand, Berry took the question about what she considered to be her biggest weakness and deftly made her answer display a strength.

65. At the conclusion of the interviews, all[2] the panelists were in immediate agreement that Berry was the best. Gray, who had served as the leader in the interview process, drafted a memorandum to Fairley providing him with the panel's result.

66. Gray did not work nor socialize with Fairley.

67. No one suggested that age should be a factor in the decision that was made. Gray would have been appalled had it been.

68. Gray noted that Berry had a slight lisp; this was irrelevant to the panel's decision. Gray would have been concerned if it had been since it might be discrimination based on a handicap.

69. Fairley asked Baker to draft the interview questions. Although Fairley did not realize it, Besner actually prepared the initial draft of the interview questions. As a panel, the group reviewed Besner's questions and then drafted their own, keeping some of Besner's original questions and adding some new ones.

70. Pottker received a B.A. from American University, a M.A. from the University of Maryland, a Masters of Philosophy from Columbia University and a Doctorate in Philosophy from Columbia.

71. Pottker joined the agency in 1978 and currently works in the OCR in Team III of Program Legal Group. Team III is responsible for making policy and addressing issues relating to Title IX9USCAS2000EUSCA, the anti-sex discrimination statute. Over the years, Pottker has worked in nearly every unit of OCR.

72. At one point in time, Fairley was Pottker's second line supervisor. She was never friends with him but would interact with him at retirement parties.

---

2. Gray remembered Butler being with the other panel members at this time.

73. Pottker knew plaintiff prior to the interview and considered him to be both a friend and a colleague. They shared an office for a period of time and Pottker thought plaintiff was a very considerate office mate. Pottker thought that plaintiff operated under a high degree of stress and that he took offense easily.

74. Pottker was not impressed with plaintiff's application. She noted that, in some instances, rather than listing his duties and accomplishments in his current position, plaintiff merely copied the vacancy announcement word for word. Pottker also noticed that the application contained grammatical and spelling errors.

75. Plaintiff's interview with the panel took place on July 1, 1998.

76. Pottker thought that plaintiff was combative during his interview and that his answers were often inadequate. She also thought that he was not enjoying the process and seemed angry and resentful for having to answer the panel's questions. Pottker thought that plaintiff's answers were at times defensive and hostile. Pottker was particularly disappointed with plaintiff's statement that he had no weaknesses.

77. Pottker knew Berry before the interview but not very well.

78. Pottker was impressed with Berry's application. She thought that Berry had taken a considerable amount of time to prepare the application even though she did notice one typographical error.

79. Pottker thought that Berry was enthusiastic and had good eye contact during her interview although her speech was at times hard to understand. Pottker thought Berry's answers were more detailed and better overall.

80. Pottker had a friendly relationship with Powell and had shared an office with her. Pottker thought Powell was knowledgeable as a professional but that she did not communicate well.

81. Pottker did not know Ward–Wooton very well but did attend her funeral.

82. Pottker thought Berry and Powell were the two best candidates.

83. Plaintiff was Pottker's last choice for the position.

84. Pottker testified that age was never a consideration in the panelists' decision and, if it had been, she would have reported it to the selecting official and would have been very uncomfortable because it would have been illegal.

85. Pottker indicated that the panelists worked hard to make their decision a fair one.

86. The panelists were concerned about Berry's language skills and they discussed the fact that Berry did not have as much education as the other candidates. They then concluded, however, that since the position's KSA's did not include a specific educational requirement, this difference in the candidates' backgrounds was not critical.

87. Although Butler knew the plaintiff prior to the interview, she didn't realize that he had a law degree until the interview. She also found out during the interview process that plaintiff had worked at the presidential level and that he had a

broad understanding of the issues in the office.

88. Butler thought that Berry's answers were rehearsed and that she had put a lot into the preparation for the interview. Butler thought Berry appeared very confident in the interview and sure that she would get the job.

89. Butler thought that plaintiff did better on the interview than Berry because, although Berry was familiar with the basic procedures used by the customer service team, plaintiff indicated that he would focus his attention on listening to the customers and thinking through an appropriate remedy.

90. Ultimately, Butler thought that plaintiff and Powell were better suited for the position than Berry.

91. After the interviews were completed, Berkowitz, Gray, and Pottker reviewed their notes and unanimously decided to recommend Berry.

92. One week after the interviews, Gray asked Butler to initial a memorandum recommending Berry for the position, which Butler did. Although Butler never voiced the opinion she testified to at trial—that plaintiff was the best applicant—to the other panelists, she did give them her proxy.

93. The panelists did not rank the candidates. Rather, on July 15, 1998, the panel sent Fairley a memorandum unanimously recommending Berry. Fairley testified that, although he made the final decision, he gave the panel's recommendation almost equal weight, describing their input as being 49% and his as being 51%.

94. Fairley reviewed each applicant's 171 before beginning the interviews. He also made notes during the interviews.

95. Plaintiff's interview with Fairley lasted approximately twenty minutes.

96. Overall, Fairley did not think that plaintiff was the right person for the position. Fairley thought that plaintiff was approaching his work from the perspective of an attorney and not someone whose goal was customer service. Fairley also thought that plaintiff was not the type of person who could bring people together and do planning and coordination work. In addition, Fairley thought that plaintiff was often withdrawn and rarely smiled. Finally, Fairley described plaintiff as a troubled employee who was often adversarial at meetings.

97. Overall, Fairley was positively impressed with Berry at the conclusion of her interview. He thought that she showed a high level of awareness of the OCR's mission and that she was able to discuss various issues with a degree of complexity that he had not seen before. Fairley did note, however, that she lacked verbal communication skills. At the conclusion of Berry's interview, Fairley told her she was the panel's first choice.

98. At no point in time did Fairley speak to Dooley about promoting Berry.

99. At the time of the selection, Fairley was serving as the Executive Officer & Director of the Resource Management Group and was fifty-nine (59) years old.

100. On July 23, 1998, Fairley certified his selection of Berry.

101. Fairley testified that age was not a factor in his decision and that he abhorred discrimination in all guises and had spent a career working against the problem.

102. After the decision to promote Berry was made, Baker called all the applicants together to notify them of Fairley's selection.

103. At that meeting, the questions that had been drafted by Besner for use during the interview were handed out. Powell realized that these questions were not the ones she had been asked during her interview.

104. After the meeting had ended and the participants were leaving, Powell heard Berry say to Besner: "Thank you for the information you gave to me and what to study. It really helped." She did not know what this meant but she is certain that she did not hear the word "questions."

105. At one point, after Lucas learned of this conversation from Powell, plaintiff's counsel, John Karl, presented her with a declaration to sign to support plaintiff's claim that Berry had gotten unfair help from Besner. There were, however, inaccuracies in that declaration. As initially written, the declaration stated that Powell heard Berry use the word "questions," implying that Berry was thanking Besner for the questions. Powell crossed that section out and returned it to Karl, who said that he could not have a declaration with a word crossed out. Karl therefore had the declaration re-typed. The new declaration, the one Powell signed, does not state that Powell heard Berry thank Besner for the questions. Rather, the revised declaration states that Powell heard Berry thanking Besner for the "information."

106. When Besner learned what Powell had done, he tore up a copy of her declaration and stuck it under Berry's office door. He also sent an e-mail to numerous individuals suggesting that disciplinary action should be taken against someone who, like Powell, perjured herself.

107. After receiving the e-mail, Powell complained to Miller, who happened to be one of the original recipients of the e-mail. Miller then sent Powell an e-mail stating that it was unlawful to intimidate or harass someone who had filed a complaint. Powell had previously filed an ADEA case with the EEOC, but the case was dismissed and Powell did not file suit.

108. Besner was a GS–14 and as a result many people went to him for help. Powell admitted that she had asked Besner what she should study for the interview and that Besner told her: "You will be okay."

109. After Berry was selected for the position, several individuals expressed concern over the fact that Berry was selected over the other candidates. Miller was in charge of investigating the selection process for the union.

110. On July 22, 1998, plaintiff contacted the DOE's Equal Employment Opportunity office regarding his non-selection.

111. On November 16, 2001, plaintiff filed the current lawsuit.

112. After the selection, plaintiff continued to work with Butler in connection with the union. Plaintiff was union President at the time and Butler worked on his campaign. Plaintiff appointed Butler Secretary of the union. Plaintiff also assisted in getting Butler moved into a new office and helped her get a permanent assignment with another supervisor.

## CONCLUSIONS OF LAW

I do not find that plaintiff established by a preponderance of the evidence that age was a motivating or determining factor in the selection of Berry. To the contrary, I find that age was irrelevant to (a) the panel's unanimous determination that Berry was the most qualified applicant and (b) Fairley's decision that Berry should receive the promotion.

## ANALYSIS

### I. *The ADEA*

Pursuant to the ADEA, an employer may not "fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Plaintiff has the burden of establishing that it is more likely than not that age was a determining or even a motivating factor in the decision not to promote him and to choose another applicant. *Forman v. Small,* 271 F.3d 285, 292 (D.C.Cir.2001), *cert denied,* 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002).

### II. *Analysis*

On June 14, 2006, I denied *Defendant's Motion for Summary Judgment.* Specifically, I concluded that if plaintiff's testimony that Fairley called him an "old timer" as he entered the room to be interviewed was credited, this was an explicit reference to plaintiff's age by the decision maker at the very moment of plaintiff's interview. When construed in the light most favorable to plaintiff, the reference to plaintiff as "old timer" met the standard of sufficiency articulated in the cases involving references to the plaintiff's age, race or protected behavior.[3] There was a genuine issue of fact as to whether Fairley made such a comment and as to what he meant by it. I also concluded that, while defendant produced evidence of a non-discriminatory reason for the decision—that Berry was more qualified—plaintiff presented insufficient evidence to show that his qualifications were so superior to Berrys that the jury could find defendant's explanation pretextual on that basis alone.

Finally, I concluded that there was nevertheless sufficient other evidence to support the conclusion that the reason for Berry's selection was pretextual: i.e., "1) a substantial discrepancy in age between the successful applicant and the plaintiff,[4] 2) testimony by plaintiff that his qualifications were superior and that management's opinion was neither objective nor fair, 3) supporting testimony by two colleagues who, having worked with Berry and plaintiff, considered plaintiff superior to Berry in the knowledge, skills and abilities the job demanded." *Lucas v. Paige,* 435 F.Supp.2d at 175.

At trial, however, plaintiff failed to provide evidence to convince me that it is

---

3. *See Lucas v. Paige,* 435 F.Supp.2d 165, 171–72 (D.D.C.2006), and cases cited therein.

4. *See O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

more likely than not that age was a determining or motivating factor in the decision to promote Berry rather than him. Therefore, after having an opportunity to hear the testimony and assess the credibility of all of the witnesses, I find for the defendant on plaintiff's claim of age discrimination under the ADEA.

I will now provide an analysis of my reasons for this conclusion.

### A. *Plaintiff's Contentions*

Plaintiff's central contentions are: (1) he was so much more qualified than Berry that no reasonable person would have chosen her over him; (2) that he was victimized by a conspiracy in which Fairley and Dooley conspired to make sure that Fairley advanced the people whom Dooley favored; this continued even after Dooley left so that her "pets" were taken care of by Fairley; (3) Fairley's reference to the plaintiff as an "old timer" as he entered Fairley's office to have his interview evidences that Fairley based his decision to hire Berry and reject plaintiff on plaintiff's age; (4) Berry was given the most unfair benefit of being given the actual questions that were used during the interview before the interview took place. Unfortunately for plaintiff, none of these contentions were supported by the evidence.

### B. *A Comparison of the Qualifications of Plaintiff and Berry*

### 1. *The Written Applications*

First, like the panelists, I have reviewed the applications that plaintiff and Berry submitted. While Berry's does contain a few typographical and grammatical errors, plaintiff's contains its fair share as well. It does not appear to have been proofread. More to the point, it often simply copies what the vacancy announcement says in the section of the application where the applicant is supposed to explain why he or she believes that his or her experience meets the requirements of the position. It is a thoroughly unimpressive document. Had I received such a document from an applicant for a position in which I was the hiring official, I certainly would not have advanced his or her application to the interviewing phase. That the personnel specialist nevertheless gave plaintiff a score of 94 points while Berry got a 95[5] indicates that plaintiff was the beneficiary of a remarkably generous evaluation by that specialist.

### 2. *The Panelists' Testimony*

I credit completely the testimony of the three members of the panel, Gray, Berkowitz and Pottker, that Berry was the most impressive during the interviews and, on the other hand, plaintiff's performance during the interview was disappointing. At one point, he literally insisted on his own infallibility; he denied he had any weaknesses.

On the other hand, the panelists found Berry dynamic and well qualified. Having heard her testimony and compared it with plaintiff's, I can see why. Berry presented the overall impression of a hardworking person who had leadership potential and who had advanced from one of the lowest GS ratings to the job she got by virtue of her enthusiasm and her skill. Plaintiff, on the other hand, left me with the impression that he believed he was somehow entitled to the job because Berry had worked for him at one point and because he was a lawyer and she was not.

I must emphasize how impressive these three witnesses were. Despite the passage of time since the interview, their recollections were excellent and they ex-

---

**5.** *See Lucas v, Paige,* 435 F.Supp.2d at 172.

plained in detail and, at some points, question by question which answer by which applicant was correct and why they found the answer by one applicant either more or less impressive than the answer by the other. Cross examination of these three witnesses did not undermine their credibility. I found that each of them brought to their task complete objectivity and neutrality and I cannot imagine their permitting the comparative ages of Berry and plaintiff to have anything to do with the decision they made. That Fairley then made the same decision underscores why there is no evidence that the reason for selecting Berry—that she was more qualified—was a pretext for age discrimination.

I appreciate that at trial Butler differed from her fellow panel members, and testified that plaintiff was more qualified than Berry. But, her testimony is undercut by her giving her proxy to her fellow panel members, without objection, thereby making their determination that Berry was most qualified unanimous. Whatever second thoughts Butler may have had once she began to hear the rumors about Berry's being given the questions the panel used, her belated assertion that plaintiff was more qualified does not undercut the overwhelming probative force of the other panel members' testimony to the contrary.

I note that Powell, who worked with both Berry and Lucas has significant reservations about Berry's qualifications for the job. But, it must be recalled that Powell was not on the panel and therefore had no opportunity to assess Lucas's and Berry's performance during the interviews. It was a comparison of their performances during the interviews by the panel and Fairley that led to Berry's selection.

## C. *The Conspiracy/Pre–Selection Claim*

As I noted above, plaintiff contends that Berry was preselected for the position because there was an overt understanding that those employees favored by Ann York Dooley would be favored by Fairley. But, there is simply no evidence whatsoever that Dooley had any influence over the individual panelists or over Fairley. Dooley, a witness I found to be extremely credible, testified that she did not have any influence over the hiring decisions Fairley made and never spoke to him about Berry. She also testified that 1) she had no influence over Pottker and considered her to be a peer, 2) she did not know Berkowitz very well, 3) she did not discuss the panel selection criteria with Butler, and 4) she did not know Gray very well either. Thus, even though Dooley testified that there were problems with plaintiff's work and his ability to function as a team member at the OCR, there is no evidence that she ever shared her views about plaintiff with any of the panelists or with Fairley, the hiring official. Finally, it is worth noting that, at the time of the interviews and the hiring decision, Dooley had already retired from the agency. Plaintiff's pre-selection theory therefore is unsupported by any evidence and collapses of its own weight.

I must also note that advancing a preselection theory is one of those instances, suggested by the Court of Appeals, in *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C.Cir.1998) (en banc), where a Title VII plaintiff can shoot himself in the foot. While evidence of preselection may be evidence of an illegal discriminatory motive, it is also true that the more likely that the reason for the selection was, for example, personal friendship between the hiring official and the selectee, the less likely it is that the motivation for the selection was an impermissible one such as

age. Thus, if there were any evidentiary basis for the theory that Dooley's "pets" were favored, it would defeat rather than advance the claim that Fairley's decision was based on plaintiff's age.

### D. *Fairley's Comment*

 Plaintiff claims that Fairley discriminated against him based on his age when he commented during the interview that plaintiff was an "old timer" and then selected Berry for the position. Fairley testified that he would not have used the expression "old timer;" he might have said "old pro," meaning that Lucas has been through the process before.

It is not necessary to resolve the controversy as to what (if anything) Fairley said as plaintiff entered the room for his interview. Assuming that Fairley used the word "old" in referring to plaintiff as an "old timer" or an "old pro" it was, as defendant has claimed from the beginning, simply a reference either to the fact that plaintiff had been employed by the OCR for a long period of time and was familiar with the interview process or a friendly reference to the fact that Fairley and plaintiff were older men.[6] A characterization of Fairley's use of the expressions "old timer" or "old pro" as proof that he harbored a discriminatory animus and that plaintiff's age was a motivating factor in the selection of Berry is utterly unconvincing. First, I credit Fairley's testimony that he had spent much of his career in civil rights enforcement and that he would not have permitted age to be the basis for any personnel decision he made. Second, I also credit his detailed explanation of why he chose Berry rather than plaintiff and I certainly cannot find that his use of the word "old" in itself permits the conclusion that that explanation was a mere pretext for age discrimination.

Furthermore, there is no evidence that any of the interview panelists considered the age of the candidates in making their decision when, independently of Fairley, they unanimously concluded that Berry was the most qualified applicant. Nor is there any evidence that Fairley influenced their decision, whatever his motivation. Since the panel's decision corroborates Fairley's reasoning and his testimony about it, there is no evidence, besides his possible use of the word "old," that would permit the conclusion that he and the panel were all motivated by age discrimination in making the decisions they did. I cannot possibly find that the panelists harbored a discriminatory animus because of what Fairley said when none of them heard him say it.

### E. *Berry's Receiving the Questions in Advance*

This question of whether there was any evidence that Berry received special assistance before the interview has had a long history in this case. In my memorandum opinion, dated September 29, 2004, I explained why there was no evidentiary basis for plaintiff's specific assertions in his *Proposed Statement of Material Facts* that Berry received the interview questions and coaching from Besner prior to her interview and that plaintiff and Powell heard Berry thank Besner for giving her the interview questions prior to the interview. *Lucas v. Paige*, Civ. No. 01–2392, Memorandum Opinion at 18–20 (D.D.C Sept 29, 2004). I then explained how plaintiff had contradicted himself by first stating during the administrative hearing that he heard Berry thank Besner for telling her what to study but he did not say anything about Besner giving Berry the interview questions. In a response to an interrogatory

---

**6.** Fairley recalled that he and plaintiff took smoke breaks together on occasion.

Lucas stated that Powell heard the conversation in which Berry thanked Besner for helping her and providing her with the questions. But, Powell specifically indicated that she never heard the word "questions" in the conversation she heard between Besner and Berry and declined to sign a declaration stating that she said she did. *Id.* At his deposition, plaintiff testified that he heard Besner say to Berry "Did the material help you or did the questions help you." *Id.*

At trial, plaintiff testified that he heard Berry thank Besner for telling her what to study and he was, of course, impeached with the prior inconsistencies in his testimony, particularly that he heard Berry thank Besner for providing Berry with the questions. Since he retreated from his assertion that Berry thanked Besner for giving her the questions, his testimony provides no support for any assertion that Berry got the questions from Besner before her interview.

Butler testified that she heard rumors that Berry had the questions but those rumors are worthless. Powell testified that she heard Besner congratulate Berry on her promotion and then heard Berry thank Besner for the information Besner had given her and for telling Berry what to study. As just noted, Powell refused to sign the declaration given her in which she was to say that she heard the word "questions." Berry denied that the conversation with Besner in the hallway had occurred and Besner was so incensed by what Powell said about his conversation with Berry, that he not only denied having it but accused Powell of perjuring herself when she indicated what she heard Besner allegedly tell Berry under oath.

There is an additional complication. The testimony at trial established that the questions Besner drafted were not the final questions the panel used. This explains why, when the questions said to be the ones used during the interview were distributed at a staff meeting after Berry's selection, Powell found that they were not the questions that were used when she, Berry, and plaintiff were interviewed.

Finally, Butler described Berry's performance as rehearsed but added that she thought that Berry had "put a lot" into her preparation for the interview.

Trials teach that no three human beings who see an event will remember it the same way. It is impossible to reconcile what plaintiff and Powell say they heard with Berry's and Besner's denial that there was ever such a conversation. Furthermore, plaintiff's testimony as to what he heard is severely impeached by his prior inconsistencies. But, if I take what remains of plaintiff's best case—that Powell is telling the truth and Besner and Berry are not—all that is left is that Berry thanked Besner for the information Besner had given her and for telling Berry what to study. First of all, I cannot possibly draw from this statement that Berry had the questions in advance of the interview without disregarding Powell's insistence that she did not hear the word "questions." Second, to infer from that statement that Berry and Besner engaged in a deceptive act of cheating is to draw an inference that is not based on anything at all. Finally, whatever motivation Besner had to help Berry (if that is what he did) hardly establishes that Fairley's decision to pick Berry over plaintiff was based on plaintiff's age.

## CONCLUSION

In the final analysis, plaintiff provided no evidence whatsoever that either the interview panelists or the selecting official based their decisions on his age. I therefore do not find that plaintiff established by a preponderance of the evidence that

age was a motivating factor in the selection of Berry. To the contrary, I find that age was irrelevant to (a) the panel's unanimous determination that Berry was the most qualified applicant and (b) Fairley's decision that Berry should receive the promotion. As a result, plaintiff has failed to prove by a preponderance of the evidence that he was discriminated against on the basis of his age, in violation of the ADEA. Accordingly, I find for the defendant and the Clerk of the Court will enter final judgment in favor of the defendant.