08-5013-cv
Fincher v. Depository Trust and Clearing Corp.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: October 15, 2009          Decided: May 14, 2010)

Docket No. 08-5013-cv

---------------------------------------

CYNTHIA M. FINCHER,

Plaintiff-Appellant,

- v. -

DEPOSITORY TRUST AND CLEARING CORPORATION,

Defendant-Appellee.

---------------------------------------

Before:   SACK, LIVINGSTON, and LYNCH, Circuit Judges.

Appeal from the award of summary judgment by the United States District Court for the Southern District of New York (William H. Pauley, Judge) dismissing plaintiff Cynthia Fincher's employment discrimination and related claims against her former employer, the Depository Trust and Clearing Corporation. The plaintiff alleges, in part, that the defendant retaliated against her for bringing a complaint of discrimination by declining to investigate that complaint. We conclude that an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint. Because the

plaintiff's remaining discrimination claims also lack merit, we affirm the judgment of the district court.

Affirmed.

STEPHEN T. MITCHELL, Stephen T. Mitchell, P.C., New York, NY, for Plaintiff-Appellant.

FREDERIC C. LEFFLER, Proskauer Rose LLP (Rebecca L. Berkebile, of counsel), New York, NY, for Defendant-Appellee.

SACK, Circuit Judge:

The plaintiff, Cynthia Fincher, is an African-American woman who was employed by the defendant, Depository Trust and Clearing Corporation ("DTCC").  She first held the position of product manager in the company's International Tax Department. Thereafter, she was a Senior Auditor in the Financial/Operations Division of the company's Audit Department.  She resigned her employment on June 5, 2006.  She subsequently brought suit in the United States District Court for the Southern District of New York alleging that she was the victim of racial discrimination with respect to training opportunities, performance evaluations, and salary decisions during her time in the Audit Department. She also claimed that she was subjected to unlawful retaliation, a hostile work environment, and constructive discharge.  Central to the latter three claims was Fincher's contention that DTCC failed to investigate a complaint of discrimination that she allegedly made to the company's senior director of employee relations.

2

Upon motion for summary judgment by DTCC, the district court (William H. Pauley, Judge) dismissed all of Fincher's claims. Fincher appeals, arguing that DTCC's failure to investigate her complaint of discrimination was itself an act of retaliation for making the discrimination complaint, and that it also contributed to a hostile work environment and her constructive discharge. Fincher also challenges the dismissal of her underlying discrimination claims on the ground that the district court improperly disregarded her deposition testimony that her manager at the defendant's auditing department told her that she had been given inadequate training because of her race.

Accepting as we must at this stage of the proceedings that Fincher's testimony to the effect that DTCC failed to investigate her complaint of racial discrimination is true, we nonetheless conclude that such a failure does not constitute an adverse employment action taken in retaliation for the filing of the same discrimination complaint. We also conclude that Fincher has failed to raise a triable issue of material fact as to her other claims of retaliation, or her claims of hostile work environment or constructive discharge. And inasmuch as Fincher has failed to support her underlying discrimination claims with more than a "scintilla of evidence," summary judgment as to those claims was also proper.

We therefore affirm the judgment of the district court.

**BACKGROUND**

Fincher was employed by DTCC from February 2001 to June 2006. She worked as a product manager for the company's International Tax Department until that position was eliminated in October 2004. She then moved to the company's Financial/Operations Division of the Audit Department, where she was a Senior Auditor despite a lack of auditing experience. Between October 2004 and May 2006, in order to perform her duties, she relied upon several training courses provided to all auditors in her department, an audit manual, and guidance from co-workers.

Fincher testified that a co-worker on her first assignment worked with an experienced manager. Fincher's first manager was, by contrast, a consultant unfamiliar with DTCC auditing procedures. And on one occasion, two of Fincher's co-workers underwent unspecified training at a session that Fincher was not asked to attend.

In March 2005, Fincher received an official "Performance Appraisal" for her first two months in the Audit Department during 2004. It was signed by the Audit Department manager, Mark Hudson. It contained a handwritten note addressed to Fincher explaining that she had received "[a] good first review but further audit skill development is needed before more indepth [sic] feedback can be given. Keep trying. . . ." 2004 Appraisal at 1. She received a mark of "Fully Competent" in

4

every performance category for which she was graded. "Fully Competent" was in the middle of the grading scale, which ranged from "Unacceptable" to "Exceptional."

Fincher's Performance Appraisal for 2005, compiled in this instance by Fincher's supervisor Donald Simpson, and then approved by Hudson on January 11, 2006, reflected a grade of "Requires Improvement" for most of the performance categories. For this performance evaluation, managers were instructed to give a grade of "Requires Improvement" only to employees in the bottom 5-15% of the company. Fincher's review contained several "Fully Competent" evaluations, reserved for employees in the middle 55-65% of the company, but also several "Unacceptable" grades, reserved for the bottom 0-5% of employees. For example, Fincher received a grade of "Unacceptable" under "Demonstrates the technical/functional skills to do the job," and under "Can be counted on to complete assignments with minimal follow-up." 2005 Appraisal at 2, 3. A concluding section labeled "Manager's Comments" asserted that Fincher frequently failed to meet deadlines and indicated that the department's managers had a poor overall impression of Fincher's work. Id. at 4.

On March 1, 2006, Fincher received by email attachment a Project Evaluation for a particular audit that she had completed. It reflected the grade of "Requires Improvement" in every category for which an evaluation was given.

On March 23, 2006, Fincher received a written "Performance Warning" from Hudson. It purported to document

5

various perceived shortcomings in Fincher's work, including failure to complete tasks "within allotted timeframes." It also informed Fincher that she was "being placed on written warning for poor performance. . . . [F]ailure to immediately improve and sustain an acceptable level of performance, or further performance deficiencies, will result in further disciplinary action, up to and including termination of your employment." Memorandum from Mark Hudson to Cynthia Fincher, "Written Performance Warning," Mar. 23, 2006.

In late March 2006, Fincher had a conversation with Charles Smith, the Senior Director of Employee Relations at DTCC, in the lobby of their office building. They were professional and social acquaintances who occasionally lunched together. According to Fincher, she complained to Smith that "black people were set up to fail at [the Auditing] department because they were not provided and given the same training opportunities as the white employees." Fincher Dep. 202. Smith's recollection is different.[1]

About one week later, Fincher and Smith had another conversation as to which their recollections also conflict. According to Fincher, she asked Smith whether he or his manager was planning to take action in response to the complaint of

---

[1] Although we are required to and do credit Fincher's account at this stage of the proceedings, we note that according to Smith, Fincher only made a casual remark that "if you are white they hold your hand and if you are black, they don't." Smith testified that he did not understand Fincher to be lodging a complaint of discrimination. Smith Dep. 124.

6

discrimination she had made during their first conversation. Smith told her that the complaint would not be addressed.[2]

Fincher also testified to a conversation she had with her manager, Mark Hudson, in his office in May 2006. He "admitted to me," she said, "that he was forced to write me up, and he . . . had informed [Human Resources Employee Elizabeth] Baez that I did not receive proper training, and he admitted that I was discriminated against." Fincher Dep. 125. She said he said that "[she] was not the only one being discriminated against." He allegedly named one Herb Fray as also having been subjected to discrimination. Id.[3]

On June 5, 2006, Fincher resigned her employment. In a letter addressed to Baez, she said that her resignation was "due to [] racial discrimination," including "receiving inadequate training." Resignation Letter to Elizabeth Baez, June 5, 2006. The letter concluded: "I was forced out because of racial discrimination and because I am aware of the fact that the company did not act on racial discrimination complaints brought forth by myself and others." Id.

In a second letter, also dated June 5, addressed to Meriam Murphy-Jones, a Vice President in the Audit Department,

---

[2] According to Smith, Fincher simply repeated her remark that "if you are white they hold your hand and if you are black, they don't." Smith Dep. 125. Smith testified that he asked Fincher whether she was making a serious complaint, and that, when she indicated that she was, Smith "put the wheels in motion to investigate." Id.

[3] Hudson, who was not deposed, submitted an affidavit in which he denied that the conversation took place.

Fincher announced her resignation, explaining that she had been "offered a position as Vice-President at another firm; therefore my last day will be on Friday June 16th." Resignation Letter to Meriam Murphy-Jones, June 5, 2006.

Then, without first making a complaint to the Equal Employment Opportunity Commission ("EEOC"), Fincher brought this employment discrimination action against DTCC in the United States District Court for the Southern District of New York. She alleges violations of the Civil Rights Act of 1991, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), New York State Executive Law § 296, and the New York City Administrative Code § 8-502 (the New York State and New York City Human Rights Laws, or the HRL and CHRL, respectively).

Count I of her complaint alleges that she was subjected to racial discrimination with respect to training opportunities, performance reviews, and salary decisions. Count II alleges that she was the victim of retaliation for making a complaint of racial discrimination to Smith, and that she was subjected to a hostile work environment. Both the retaliation claim and the hostile work environment claim were based on DTCC's alleged failure to investigate Fincher's complaint of racial discrimination to Smith. Count II of the complaint also asserted a claim of constructive discharge based on the allegations of retaliation and hostile work environment made in the same claim for relief. See Compl. ¶ 17 ("[Fincher] was compelled to leave

8

the firm for these reasons."). The complaint did not indicate which alleged conduct she was challenging under which of the statutes she invoked.

DTCC moved for summary judgment. On September 17, 2008, the district court issued a Memorandum and Order granting DTCC's motion and dismissing Fincher's claims in their entirety. Fincher v. Depository Trust & Clearing Corp., No. 06 Civ. 9959, 2008 WL 4308126, 2008 U.S. Dist. LEXIS 70046 (S.D.N.Y. Sept. 17, 2008). The district court dismissed Fincher's Title VII claims for her failure to satisfy the necessary precondition for such claims of filing a complaint with the EEOC. Id., 2008 WL 4308126, at *3, 2008 U.S. Dist. LEXIS 70046, at *7.

As to her discrimination claims under 42 U.S.C. § 1981, the district court concluded that Fincher had failed to show that the circumstances of her training, performance evaluations, or compensation gave rise to an inference of discrimination, and that she had therefore failed to establish a prima facie case of discrimination. Id., 2008 WL 4308126, at *3-4, 2008 U.S. Dist. LEXIS 70046, at *7-11. In reaching this conclusion, the court appears to have discredited Fincher's testimony that Hudson told her that he thought she had been discriminated against, noting that Fincher's testimony "is not supported by anything other than [her] ipse dixit." Id., 2008 WL 4308126, at *4, 2008 U.S. Dist. LEXIS 70046, at *10. "Hudson denies making such statements and Fincher has not offered any direct or circumstantial evidence to corroborate her testimony." Id.

9

Turning next to Fincher's retaliation, hostile work environment, and constructive discharge claims under section 1981, the district court concluded that Fincher had failed to show that she suffered any retaliation for complaining of discrimination to Smith because DTCC's failure to investigate that complaint was not an adverse employment action. Id., 2008 WL 4308126, at *4-5, 2008 U.S. Dist. LEXIS 70046, at *11-13. The court similarly found that the failure to investigate Fincher's complaint did not create a hostile work environment, and that Fincher had failed otherwise to establish a triable issue of material fact as to the existence of a hostile work environment. Id., 2008 WL 4308126, at *5, 2008 U.S. Dist. LEXIS 70046, at *13. As a result of the failure of the hostile work environment claim, the court concluded that her constructive discharge claim was also meritless. Id., 2008 WL 4308126, at *5, 2008 U.S. Dist. LEXIS 70046, at *13-14.

Finally, the district court concluded that Fincher had failed to establish a claim under the New York State and City Human Rights laws, because the court was of the view that discrimination claims under those laws were analyzed under the same standards as those used for claims brought under section 1981. Id., 2008 WL 4308126, at *5, 2008 U.S. Dist. LEXIS 70046, at *14.

Fincher argues on appeal that DTCC's failure to investigate her alleged complaint of discrimination constituted retaliation for her bringing that same complaint. She also

10

argues that the failure to investigate her complaint, in light of the "totality of the circumstances," created a hostile work environment, and amounted to a constructive discharge. Finally, she argues that the district court did not give sufficient consideration to her testimony about Hudson's alleged admission to her that she was the victim of racial discrimination.[4]

**DISCUSSION**

I.  Standard of Review

"We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any

---

[4] A fourth argument made by Fincher, that summary judgment should not have been granted because Smith allegedly contradicted himself in the course of his deposition, does not warrant extended discussion. The contradiction identified by Fincher is the tension between Smith's initial testimony that he did not learn that Fincher had complained of racial discrimination until she resigned, Smith Dep. 48, and his later testimony that he had heard her complain about discrimination before she resigned but had not thought that she was making a serious complaint, Smith Dep. 124. First, to the extent this tension can be considered an inconsistency, it is immaterial, because the district court accepted, for purposes of summary judgment, Fincher's testimony that her late-March 2006 remarks to Smith constituted an actual complaint that he and the company failed to investigate, and we make the same assumption. Second, Smith's alleged mendacity could not in itself constitute sufficient evidence to establish a prima facie case of discrimination. Cf. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (explaining that defendant's lack of credibility, "together with the elements of the prima facie case," may be used by fact-finder to infer intentional discrimination) (emphasis added).

11

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see also Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Roe, 542 F.3d at 35 (internal quotation marks omitted). "A fact is material if it might affect the outcome of the suit under the governing law." Id. (internal quotation marks omitted).

## II. Retaliation

### A. Federal Retaliation Claims

Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting analysis.[5] See, e.g., Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir. 1988). First, the plaintiff must establish a prima facie case of retaliation. If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory. If the employer succeeds at the second stage, then the presumption of retaliation dissipates and the plaintiff must show that

---

[5] Fincher does not challenge the district court's finding that her Title VII claims are barred because she failed to file an EEOC complaint, and we do not review that finding here. See, e.g., United States v. Joyner, 313 F.3d 40, 44 (2d Cir. 2002) ("It is well established that an argument not raised on appeal is deemed abandoned and lost, and that a court of appeals will not consider the argument unless it has reason to believe that manifest injustice would result otherwise." (internal quotation marks omitted)).

retaliation was a substantial reason for the complained-of action. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).

In this case, the district court granted summary judgment in favor of DTCC based on the court's conclusion that Fincher had failed to establish a prima facie case of unlawful retaliation. In order to establish such a prima facie case,

> a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find (1) that [s]he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (alterations incorporated); accord Lizardo v. Denny's, Inc., 270 F.3d 94, 105 (2d Cir. 2001).[6]

The district court concluded that Fincher had failed to establish a prima facie case of retaliation because even accepting, for purposes of summary judgment, her testimony that

---

[6] Although we refer to an "adverse employment action" in applying the test, see also, e.g., Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (2d Cir. 2006), such an action need not affect the terms and conditions of a plaintiff's employment for purposes of a retaliation claim, see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61-67 (2006) (discussing Title VII anti-retaliation provision); cf. Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (noting that for purposes of a Title VII discrimination rather than retaliation case, "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment" (internal quotation marks and emphasis omitted)).

13

she complained of discrimination to Smith in late March 2006 and that the company failed to investigate that complaint, such a failure to investigate did not constitute an adverse employment action. The anti-retaliation law "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).

> [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. We speak of material adversity because we believe it is important to separate significant from trivial harms.

Id. at 68 (internal quotation marks and citations omitted, emphasis in original).

Because we must resolve all factual ambiguities against DTCC, we accept for purposes of this appeal that Fincher made a complaint of discrimination to Smith in late March 2006 and that Smith was aware that Fincher was making a complaint. Fincher has thus satisfied the first two elements of her prima facie case. We further accept for purposes of this appeal that the company failed to investigate Fincher's complaint. We agree with the district court, however, that any such failure did not constitute an adverse employment action against Fincher.

We have said that "there are no bright-line rules" with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore "courts must pore

14

over each case to determine whether the challenged employment action reaches the level of 'adverse.'" Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).  We are of the view nonetheless that, at least in a run-of-the-mine case such as this one, an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint.  We thus adopt the position previously taken by several district courts in this Circuit.  See, e.g., Thomlison v. Sharp Elecs. Corp., No. 99 Civ. 9539, 2000 WL 1909774, at *4, 2000 U.S. Dist. LEXIS 18979, at *12-13 (S.D.N.Y. Dec. 18, 2000).

"Affirmative efforts to punish a complaining employee are at the heart of any retaliation claim." Id., 2000 WL 1909774, at *4, 2000 U.S. Dist. LEXIS 18979, at *12.  An employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint: Her situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint or had the complaint been investigated but denied for good reason or for none at all.  Put another way, an employee's knowledge that her employer has declined to investigate her complaint will not ordinarily constitute a threat of further harm, recognizing, of course, that it would hardly provide a positive incentive to lodge such a further challenge.

We do not mean to suggest that failure to investigate a complaint cannot ever be considered an adverse employment action

15

for purposes of a retaliation claim. It can be if the failure is in retaliation for some separate, protected act by the plaintiff. In Rochon v. Gonzales, 438 F.3d 1211 (D.C. Cir. 2006), upon which Fincher relies, for example, the D.C. Circuit concluded that an employer's failure to investigate a complaint of a death threat against an employee that followed a complaint of discrimination by the same employee was sufficient to state a claim of retaliation under Title VII, id. at 1219-20. But in Rochon, the refusal to respond to the employee's complaint of a death threat was allegedly in retaliation for his separate and earlier complaint of discrimination. The employee contended that if he had never complained of discrimination, his complaint of a death threat against him would have been investigated. Id. Making the initial complaint allegedly resulted in the separate retaliatory failure to investigate a subsequent complaint. See id. at 1220 ("[A] reasonable FBI agent well might be dissuaded from engaging in activity protected by Title VII if he knew that doing so would leave him unprotected by the FBI in the face of threats against him or his family.").[7] Other cases cited by Fincher similarly involve employees who allegedly suffered harms resulting from, but separate from the disposition of, their

---

[7] Of course, in Rochon, the separate complaint that was allegedly ignored as a result of the filing of the initial complaint was of a particularly serious nature. We need not decide here whether an employer's failure to investigate a complaint of discrimination in retaliation for the filing of a separate, earlier complaint of discrimination would rise to the level of an adverse employment action. That question is simply not before us.

16

initial complaints of discrimination. See Burlington, 548 U.S. at 71 (leaving for jury question of whether unwanted reassignment of employee's duties following complaint of discrimination was adverse employment action for purposes of retaliation claim); Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 659 (7th Cir. 2005) (concluding that unwanted alteration of employee's work schedule following complaint of discrimination was adverse employment action for purposes of retaliation claim).

Here, by contrast, a reasonable employee in Fincher's place had nothing to lose by bringing this complaint, or another one following it, because the result of bringing the complaint and not bringing the complaint under the conditions alleged was the same: the complaint would not be investigated. No action has been attributed to the defendant here except for the disposition -- or lack thereof -- of the same complaint that allegedly provoked the retaliatory response.

A contrary rule could have odd consequences. A person not in fact discriminated against could complain of discrimination nonetheless. If the miffed accused employer were, because of his or her anger, to decline to investigate what was in fact a false claim, the employee might have a viable suit for retaliatory failure to investigate. We do not think that to be the law.

17

Summary judgment dismissing Fincher's retaliation claims under 42 U.S.C. § 1981 was therefore proper.[8]

B. State and City Retaliation Claims

The dismissal of Fincher's state- and city-law retaliation claims must also be affirmed, notwithstanding that it was based in part on the court's arguably incorrect view that the city-law claims were to be "analyzed under the same standards as § 1981." Fincher, 2008 WL 4308126, at *5, 2008 U.S. Dist. LEXIS 70046, at *14 (citing Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006)). New York State courts and district courts in this Circuit have concluded, to the contrary, that the retaliation inquiry under the CHRL is "broader" than its federal counterpart. See Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 71, 872 N.Y.S.2d 27, 34 (1st Dep't 2009). Under the CHRL, retaliation "in any manner" is prohibited, and "[t]he retaliation . . . need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment." N.Y.C. Admin. Code § 8-107(7); see also Williams, 61 A.D.3d at 69-72, 872 N.Y.S.2d at 33-35; Sorrenti v. City of New York, 17 Misc. 3d 1102(A), 851 N.Y.S.2d

---

[8] Because we conclude that the failure to investigate a complaint cannot be considered an adverse employment action taken in retaliation for the filing of that same complaint, we do not address DTCC's argument in the alternative, which the district court also did not reach, that even if the failure to investigate Fincher's complaint could be considered an adverse employment action, she could not and did not demonstrate the requisite causal connection between her filing the complaint and DTCC's failure to investigate it to make a prima facie case of retaliation.

18

61 (Table) (N.Y. Sup. Ct., N.Y. Cty. 2007) (unreported decision) ("[T]he City Council enacted a less restrictive standard [than the federal and state standard] to trigger a [CHRL] violation in that it is now illegal to retaliate in any manner."); Pilgrim v. McGraw-Hill Cos., Inc., 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009) ("The prima facie standard for retaliation claims under the CHRL is different [from the federal and state standard], in that there is no requirement that the employee suffer a materially adverse action. Instead, the CHRL makes clear that it is illegal for an employer to retaliate in 'any manner.'").[9]

The functional difference, if any, between the CHRL standard and that used for federal and state retaliation claims has never been fully articulated. The Appellate Division, First Department, has said that the CHRL "rejects a materiality requirement," while under Burlington, federal retaliation claims must involve an action by the employer that is "materially adverse." Compare Williams, 61 A.D.3d at 71 & n.12, 872 N.Y.S.2d 34 & n.12, with Burlington, 548 U.S. at 68. The proper inquiry under the CHRL is whether a jury could "reasonably conclude from the evidence that [the complained-of] conduct [by the employer] was, in the words of the [CHRL], reasonably likely to deter a person from engaging in protected activity," without taking account of whether the employer's conduct was sufficiently

---

[9] The New York Court of Appeals has not yet ruled on the issue.

19

deterrent so as to be "material[]." Williams, 61 A.D.3d at 71, 872 N.Y.S.2d 34 (internal quotation marks omitted).

It is unnecessary for us to determine on this appeal whether or to what extent the "reasonably likely to deter" standard of the CHRL differs from Burlington's "well might have dissuaded" test. Fincher has not made any argument touching on the CHRL in her brief or at oral argument. Thus any assertion that she might have made to the effect that her retaliation claim should survive the arguably broader CHRL inquiry has been abandoned. See United States v. Joyner, 313 F.3d 40, 44 (2d Cir. 2002).

### III. Hostile Work Environment and Constructive Discharge

In order to establish a hostile work environment claim under 42 U.S.C. § 1981, a plaintiff "must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (plaintiff must demonstrate an "abusive working environment" (internal quotation marks omitted)). "A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987); accord Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000). "[T]he plaintiff must show more than a few isolated

20

incidents of racial enmity," Williams v. County of Westchester, 171 F.3d 98, 100-01 (2d Cir. 1999) (per curiam) (internal quotation marks omitted), although a hostile work environment can also be established through evidence of a single incident of harassment that is "extraordinarily severe," Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000); Alfano, 294 F.3d at 374.

Fincher argues that DTCC's failure to investigate her discrimination complaint, considered in light of "the totality of the circumstances," created a hostile work environment for her. But the failure to investigate did not by itself alter the terms and conditions of Fincher's employment; rather, it preserved the very circumstances that were the subject of the complaint. Therefore the failure to investigate Fincher's complaint could not itself have contributed to or constituted a hostile work environment. Cf. Robles v. Argonaut Rest. & Diner, Inc., No. 05 Civ. 5553, 2009 WL 3320858 at *8, 2009 U.S. Dist. LEXIS 96949, at *27-28 (S.D.N.Y. Oct. 9, 2009) ("A hostile work environment claim can succeed only if plaintiff demonstrates that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of his employment were thereby altered") (citing Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001)).

Indeed, although this Circuit has not ruled on the question, in the analogous context of hostile work environment claims based on allegations of sexual harassment, "[federal]

21

courts (including district courts in this circuit) appear to have uniformly rejected the notion that a failure adequately to remediate sexual harassment itself constitutes an act that may contribute to a hostile work environment claim." Chan v. N.Y. City Transit Auth., No. 03 Civ. 6239, 2004 WL 1812818, at *5, 2004 U.S. Dist. LEXIS 16370, at *15 (E.D.N.Y. July 19, 2004).

Fincher does not identify the facts to which her phrase, "the totality of the circumstances," refers. The evidence that she presented to the district court was to the effect that on at least one occasion, two of her co-workers were invited, without her, for unspecified training, and that on at least one occasion, one of her co-workers was assigned to work with a supervisor who was better qualified than Fincher's supervisor. We conclude that these sporadic events, none of which was personally abusive, as a matter of law do not amount to a series of abusive and pervasive incidents of discrimination, nor do they include a single extraordinary one. The hostile work environment claim fails.[10]

---

[10] Several federal district courts, as well as the New York Appellate Division, First Department, but not the New York Court of Appeals, have concluded that "less egregious conduct than that required under Title VII [or § 1981] may support a hostile work environment claim under the []CHRL." Panzarino v. Deloitte & Touche LLP, No. 05 Civ. 8502, 2009 WL 3539685, at *9, 2009 U.S. Dist. LEXIS 101209, at *29 (S.D.N.Y. Oct. 29, 2009); accord Williams, 61 A.D.3d at 79-80, 872 N.Y.S.2d at 40-41; but see Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni, 585 F. Supp. 2d 520, 537 (S.D.N.Y. 2008) ("If New York City wanted to remove the 'severe and pervasive' requirement [from hostile work environment claims], it could have done so when it amended the CHRL. It did not."). Even assuming that a hostile work environment claim under the CHRL does not require a showing of severe and pervasive incidents of discrimination, Fincher has

22

The district court also correctly granted summary judgment dismissing Fincher's constructive discharge claim. Fincher's complaint, which does not raise constructive discharge as a separate allegation, makes clear that the acts which she alleges gave rise to a hostile work environment were the same as those upon which her constructive discharge claim was based. Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). This standard is higher than the standard for establishing a hostile work environment. Id. Because Fincher failed to establish a hostile work environment, her claim of constructive discharge also fails.

IV. Underlying Section 1981 Discrimination Claims

The district court granted summary judgment dismissing Fincher's underlying section 1981 discrimination claims because it concluded that Fincher had presented no evidence giving rise to an inference of discrimination with respect to her training, salary, or performance evaluations. On appeal, Fincher makes only one argument challenging this conclusion: that the district court gave insufficient consideration to her testimony about Hudson's alleged admission that she had been the victim of

---

failed to establish a hostile work environment claim under the CHRL because she has failed even to present evidence giving rise to an inference of any discrimination at all.

discrimination with respect to training.[11] Fincher emphasizes that Hudson's alleged statements were not hearsay, although the district court gave no indication that it regarded the statements as being such and did not rule them inadmissible. Rather, the district court appeared to disbelieve Fincher's assertion that Hudson had made the statements attributed to him: "Fincher's testimony that Hudson believed she and another co-worker had been discriminated against is not supported by anything other than Fincher's ipse dixit." Fincher, 2008 WL 4308126, at *4, 2008 U.S. Dist. LEXIS 70046, at *10. The district court explained that Hudson denied making the statements. Id. But as a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury. See, e.g., Scholastic, Inc. v. Harris, 259 F.3d 73, 87 (2d Cir. 2001).

To be sure, there is an exception for "the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005); see also id. at 555 (affirming grant of summary judgment dismissing excessive force suit brought under 42 U.S.C. § 1983 where the plaintiff relied exclusively on his own testimony, which was "replete with inconsistencies and improbabilities") (internal

_____

[11] Fincher drew the connection between her argument about Hudson's alleged admission and her underlying discrimination claims at oral argument, although that connection was not drawn, at least explicitly, in her brief.

24

quotation marks omitted); see also Shabazz v. Pico, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (Sotomayor, Judge) ("[W]hen the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations, dispose of some improbable allegations, and dismiss the claim.") (internal quotation marks omitted; alterations incorporated).

That exception is not applicable in this case, however. Fincher relies exclusively upon her own testimony for the assertion that Hudson made the disputed statements, but her testimony was not contradictory or rife with inconsistencies such that it was facially implausible. Discrimination cases also tend to be particularly ill-suited to the assessment of a plaintiff's credibility at the summary judgment stage, because in such cases "the only direct evidence available very often centers on what the defendant allegedly said or did," and "the defendant will rarely admit to having said or done what is alleged, and . . . third-party witnesses are by no means always available." Danzer v. Norden Sys., Inc., 151 F.3d 50, 57 (2d Cir. 1998). Whether Fincher and Hudson had a private conversation in which Hudson made the remarks that Fincher imputes to him is a question of "he said, she said," on which the court cannot, in the context of this case, take a side at the summary judgment stage. Simpri v. City of N.Y., No. 00 Civ. 6712, 2003 WL 23095554, at *8, 2003 U.S. Dist. LEXIS 23266, at *26 (S.D.N.Y. Dec. 30, 2003); see also, e.g., EEOC v. Liberal R-II Sch. Dist., 314 F.3d 920, 924

25

(8th Cir. 2002) ("Although a jury might believe [the defendants] and disbelieve [the plaintiff], we cannot wholly dismiss [one of the defendant's] alleged [age-based comments] at the summary judgment stage.").  Fincher's testimony that Hudson made the remarks is not conclusory or speculative,[12] as was the plaintiff's testimony in the case relied upon by the district court in disregarding the remarks, see Gonzalez v. Beth Israel Med. Ctr., 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003) ("Gonzalez's conclusory and speculative assertions that [her time records were tampered with] are not enough to withstand summary judgment."), because Fincher was testifying to the content of a conversation at which she was allegedly present.  Adhering to the ordinary rule that when the defendant moves for summary judgment, we construe the evidence in the light most favorable to the plaintiff and draw all reasonable inferences in her favor, Allianz Ins. Co., 416 F.3d at 113, we decline to conclude at this stage of the proceedings that Fincher's testimony may be deemed discredited.

Although we thus accept for purposes of this appeal that Fincher's account of her conversation with Hudson is accurate, we conclude that his remarks do not provide an adequate evidentiary basis for the denial of the motion for summary judgment.  Summary judgment cannot be defeated by the presentation by the plaintiff of but a "scintilla of evidence" supporting her claim.  Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[12]  That is not to say that Hudson's alleged remarks themselves were not conclusory.  See infra.

242, 252 (1986). "[The] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Id. at 251 (internal quotation marks and emphasis omitted). Hudson's alleged remarks are at best just such a "scintilla" in light of their offhand, conclusory nature and the lack of further support in the record for Fincher's claim.

The disputed remarks were, moreover, a purported concession that Fincher was discriminated against; they were not themselves discriminatory.[13] Summary judgment might not have been justified were Hudson's alleged remarks themselves imbued with discriminatory animus, rather than a report of purportedly discriminatory action. See, e.g., Forman v. Small, 271 F.3d 285, 293 (D.C. Cir. 2001) (concluding that plaintiff satisfied prima facie burden in age discrimination case by, among other things, presenting evidence of alleged statements by decision makers that he was "over the hill" or "in the twilight of his career," and explaining that "when decision makers, or those who have input into the decision, express such discriminatory feelings around the relevant time in regard to the adverse employment action

---

[13] Moreover, even as a purported concession the disputed remarks were indirect, with Hudson referring vaguely to the discriminatory motives of others at the company, not his own, as compelling his actions toward Fincher. Cf. Lewis v. City of Chicago, 496 F.3d 645, 651 (7th Cir. 2007) (reversing grant of summary judgment where, among other things, plaintiff's supervisor allegedly admitted to her that he had denied her a certain employment opportunity on the basis of his own prejudices).

complained of, then it may be possible to infer that the decision makers were influenced by those feelings in making their decisions" (internal quotation marks omitted).  The district court correctly concluded that there was insufficient evidence of discrimination to permit the action to go to trial.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

28